IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EMILY CASTELLANOS,

    Plaintiff,

v.

KAISER FOUNDATION HEALTH PLAN
OF THE NORTHWEST

    Defendant.

Case No. 6:22-cv-00149-MC

OPINION AND ORDER

**MCSHANE, Judge:**

## INTRODUCTION

Plaintiff Emily Castellanos brings this employment discrimination action against her former employer, Defendant Kaiser Foundation Health Plan of the Northwest ("Defendant" or "Kaiser"). She brings claims alleging whistleblower retaliation (Claims 1 and 2), nursing staff retaliation (Claim 3), breach of contract (Claim 4), and wrongful termination (Claim 5). Kaiser moves for summary judgment. ECF No. 26. The Court heard oral argument on November 16, 2023. Because no reasonable jury could find in Plaintiff's favor on any of her claims, Defendant's Motion is GRANTED.

1 – OPINION AND ORDER

## BACKGROUND[1]

Plaintiff Emily Castellanos began working for Defendant Kaiser Foundation Health Plan of the Northwest ("Defendant" or "Kaiser") as a Licensed Practical Nurse in 2016. Notice of Removal 6, ECF No. 1. From 2018 until her termination in 2020, Plaintiff was staffed at Kaiser's North Lancaster Medical Clinic's Urgent Center (the "North Lancaster Clinic" or "Clinic") in Salem, Oregon. *Id*.

Beginning in March 2020, the COVID-19 pandemic began to significantly impact the day-to-day operations of the North Lancaster Clinic. Orr-Besa Decl. ¶ 8. Short-staffing and unfilled nursing positions escalated concerns amongst Clinic staff about patient and employee safety. Shaddy-Farnsworth Decl. 19, ECF No. 29. Adding to the chaos for the nursing staff, Kaiser regularly updated its COVID-19 testing protocol and workflow to align with evolving guidance from public health agencies. *Id*.; Orr-Besa Decl. ¶ 10.

The parties present conflicting accounts of the key events leading to Plaintiff's termination. According to Plaintiff's supervisor, Aimee Orr-Besa, Plaintiff's work performance started to decline in Spring 2020. Orr-Besa Decl. ¶ 11. Orr-Besa states that Plaintiff would reassign her nursing tasks to other team members instead of performing the work herself and would unfairly delegate her work duties to others at unnecessary times. *Id*. Plaintiff disputes Orr-Besa's account and asserts she had no history of corrective action, ethical problems, or concerns regarding her standard of care while working for Kaiser. Pl.'s Second Resp. Ex. 1 ¶ 4, ECF No. 34.

On September 19, 2020, Plaintiff was involved in an alleged incident of insubordination at the Clinic. According to Plaintiff, the Urgent Care unit was confronting a severe staff shortage that

---

[1] The Court views the facts in the light most favorable to Plaintiff as the non-moving Party. *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 988 (9th Cir. 2006) (quoting *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999)).

2 – OPINION AND ORDER

day. *Id*. ¶ 9. In response to staff concerns, the on-shift supervisor offered two Medical Assistants ("MA's") from another unit to assist with COVID testing. *Id*. ¶¶ 9–10. At Plaintiff's direction, the MA's assumed Plaintiff's responsibilities preparing and administering COVID tests, and Plaintiff left to perform other nursing duties. *Id*. ¶¶ 14–15. Although Plaintiff states that it was routine to have MA's perform COVID-testing on Saturdays and that she had not been notified of any change in testing protocol, the policy in place at the time was that MA's could not actually perform the tests. *Id*. ¶ 15; Orr-Besa Decl. ¶ 15.

That evening, at the conclusion of Plaintiff's shift, Plaintiff met with the shift lead for the Urgent Care unit. Pl.'s Second Resp. Ex. 1 ¶ 16. The shift lead expressed her disapproval that Plaintiff had allowed the MA's to perform COVID tests. Shaddy-Farnsworth Decl. 51. After the shift lead raised concerns about Plaintiff's conduct during her shift, Plaintiff told the shift lead that the staffing levels that day felt unsafe. *Id*.

The following morning, on September 20, 2020, Orr-Besa met with Plaintiff and the rest of the Urgent Care unit to discuss the previous day's shift. Orr-Besa Decl. ¶ 12. There, Plaintiff offered her version of the day's events and complained that the shift lead reprimanded her for following her supervisor's directives. *Id*. ¶ 14; Pl.'s Second Resp. Ex. 1 ¶ 23. Plaintiff then told Orr-Besa that she was "worried that people were going to get hurt." Pl.'s First Resp. Ex. 7, at 28; ECF No. 33.

Over the next week, Orr-Besa followed up individually with the Clinic's staff about the September 19 shift. Orr-Besa Decl. ¶ 19. Multiple members of the nursing staff disputed Plaintiff's version of events. *Id*. ¶¶ 20–24. Specifically, Plaintiff's coworkers told Orr-Besa that the on-shift supervisor had not approved MA's to administer COVID tests, and that Plaintiff directed the MA's to administer COVID tests despite reminders from multiple coworkers that MA's should not

3 – OPINION AND ORDER

perform COVID testing. *Id*. Kaiser's Director of Nursing Professional Practice ("Kaiser's Director") advised Orr-Besa that Plaintiff's reported conduct during the September 19th shift may have violated Oregon's nursing standards and created potential patient safety and liability concerns for Kaiser. *Id*.

On September 27, 2020, Plaintiff again spoke with Orr-Besa about staffing concerns at the Clinic. Pl.'s Second Resp. Ex. 1 ¶ 24. Plaintiff claims that she asked Orr-Besa if she could call a compliance hotline provided for employee issues.[2] *Id*. Orr-Besa told Plaintiff that she "didn't think it would be helpful." Shaddy-Farnsworth Decl. 45–46. Ultimately, Plaintiff never called the hotline. *Id*. at 46–47.

On October 4, 2020, Orr-Besa informed Plaintiff that Kaiser would conduct an internal investigation to determine what occurred during the September 19th shift.[3] *Id*. at 57. Orr-Besa states she explained to Plaintiff that she could bring a union representative to the meeting and that the meeting could result in corrective action. *Id*. at 58. Orr-Besa also states that she instructed Plaintiff, per Kaiser's internal investigation guidelines, not to speak to anyone other than her union representative about the investigation or about the September 19th shift until Kaiser concluded its investigation. Orr-Besa Decl. ¶ 26. According to Plaintiff, Orr-Besa never told her about the subject of the investigation, that it could result in her own discipline, or that she could not speak to others about the investigation. Pl.'s Second Resp. Ex. 1 ¶¶ 26–27.

---

[2] Neither Plaintiff nor Kaiser, in their briefings or upon inquiry at oral argument, seem to know what the compliance hotline does. It appears to be internal to the hospital, but there is no indication that it was able to or could respond to the current pandemic-related staffing issues.

[3] Kaiser refers to its internal investigation process as "joint discovery" and through it, in partnership with an employee's union, investigates potential misconduct and arrives at an appropriate corrective action. Culver Decl. ¶ 8.

4 – OPINION AND ORDER

That evening, Plaintiff texted a coworker and asked if she had received "a discovery for that one crazy Saturday." Shaddy-Farnsworth Decl. 61; Orr-Besa Decl. ¶ 28, Ex. J at 2. Plaintiff then told the coworker that she "can't talk about it" to anyone. Orr-Besa Decl. ¶ 28, Ex. J at 2. The coworker told Plaintiff that she did not know what the investigation was about. Pl.'s Second Resp. Ex. 1 ¶ 28. Four days later, on October 8, the coworker asked to meet privately with Orr-Besa to discuss her conversation with Plaintiff. Orr-Besa Decl. ¶ 28. The coworker sent Orr-Besa screenshots of her conversation with Plaintiff and told Orr-Besa she felt like Plaintiff tried to convince her to adopt Plaintiff's version of events. *Id*.

On October 17, Orr-Besa and Kaiser's Director met with Plaintiff and her union representative to discuss the September 19th shift and conclude the internal investigation. Orr-Besa Decl. ¶ 29. After interviewing Plaintiff, Orr-Besa and Kaiser's Director interviewed other nursing staff present during the September 19th shift. *See id*. Orr-Besa and Kaiser's Director concluded the internal investigation finding that Plaintiff "had violated departmental guidelines[,]" "put patients at risk[,]" "put nursing staffs' licensure at risk[,] and created potential liability for Kaiser." *Id*. ¶ 30. They also concluded that Plaintiff had attempted to interfere with the internal investigation by trying to influence her coworker's testimony, and that Plaintiff violated Kaiser's professional standards related to honesty, ethics, and professional judgment. *Id*. ¶ 31. Based on the results of its investigation, Kaiser terminated Plaintiff's employment effective October 18, 2020. *Id*. ¶ 32; Orr-Besa Decl. Ex. M.

Pursuant to a collective bargaining agreement ("CBA") between Kaiser and Plaintiff's union, Plaintiff began the grievance process following her termination. Culver Decl. ¶ 3; Pl.'s Second Resp. Ex. 1 ¶ 31. The union supported Plaintiff through three grievance steps and mediation. Culver Decl. ¶¶ 9, 12; Warner Decl. ¶¶ 4–6. Ultimately, Plaintiff's termination was

5 – OPINION AND ORDER

upheld at every stage. Culver Decl. ¶ 12. Plaintiff requested that the union support her grievance through arbitration. Pl.'s Second Resp. Ex. 1 ¶ 32. After seeking the advice of counsel and considering the merits of Plaintiff's claim, the union declined to arbitrate Plaintiff's grievance. Warner Decl. ¶¶ 4–7.

Defendant Kaiser now moves for summary judgment on all five claims.

## STANDARDS

The court must grant summary judgment if the movant shows there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). An issue is "genuine" if a reasonable jury could return a verdict in favor of the non-moving party. *Rivera v. Phillip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is "material" if it could affect the outcome of the case. *Id.* The court reviews evidence and draws inferences in the light most favorable to the non-moving party. *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 988 (9th Cir. 2006) (quoting *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999)). When the moving party has met its burden, the non-moving party must present "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (quoting FED. R. CIV. P. 56(e)).

## DISCUSSION

### I. Retaliation

Plaintiff brings three state law retaliation claims against Kaiser for whistleblower retaliation under ORS §§ 659A.199 ("Claim 1") and 659A.203 ("Claim 2"), and nursing staff

6 – OPINION AND ORDER

retaliation under ORS § 441.181 ("Claim 3"). Courts analyze retaliation claims using the *McDonnell Douglas* burden-shifting framework. *Yartzoff v. Thomas*, 809 F.2d 1371, 1375 (9th Cir. 1987) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Under the first step of the *McDonnell Douglas* framework, a plaintiff must establish a *prima facie* claim for retaliation. *Id.* To do so the employee must show 1) their involvement in protected activity, 2) an adverse employment action, and 3) a causal link between the two. *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 969 (9th Cir. 2002). The burden then shifts to the employer to articulate a legitimate, nonretaliatory reason for the adverse employment action. *Id.* at 970. Finally, the employee must offer evidence that the employer's proffered legitimate, nondiscriminatory reason is mere pretext for retaliation. *Id.*

### A. Protected Activity (Claims 2 and 3)

Kaiser first argues it is entitled to summary judgment on Claims 2 and 3 because Plaintiff did not engage in a statutorily protected activity.[4] Under ORS § 659A.203, a non-profit employer may not "[p]rohibit any employee from *disclosing*, or take or threaten to take disciplinary action against an employee for the *disclosure* of any information that the employee reasonably believes is evidence of [a] violation of any federal, state or local law, rule or regulation" or "substantial and specific danger to public health and safety resulting from action of the public . . . employer." (emphasis added). ORS § 441.181 prohibits a hospital from retaliating against a nurse who "*[d]iscloses* or intends to disclose . . . an activity, policy or practice of the hospital . . . that the [nurse] reasonably believes is in violation of law or a rule or is a violation of professional standards of practice that the [nurse] reasonably believes poses a risk to the health, safety or welfare of a

---

[4] For the purposes of its Motion for Summary Judgment, Kaiser does not dispute that Plaintiff engaged in protected activity under ORS § 659A.199. MSJ 16 n.4.

7 – OPINION AND ORDER

patient or the public." (emphasis added). Both statutes require a plaintiff to demonstrate that they made or intended to make a disclosure.

The 9th Circuit has held that an employee's report of what they perceive to be misconduct or illegal activity is only a "disclosure" if it contains "previously unavailable information." *See Lindsey v. Clatskanie People's Util. Dist.*, 140 F. Supp. 3d 1077, 1092 (D. Or. 2015). Accordingly, an employee "cannot 'disclose' information that is already publicly known." *Clarke v. Multnomah Cty.*, 303 F. App'x 512, 513 (9th Cir. 2008) (affirming 2007 WL 915175, at *14–17 (D. Or. Mar. 23, 2007) ("the 'term "disclosure" means to reveal something that was hidden and not known.'") (citation omitted). Reporting misconduct to an alleged wrongdoer is not a "disclosure" because, in such circumstances, "the employee [does] not reveal anything new." *Id.* (citation omitted). "In plain English, the disclosure must reveal previously unknown conduct in order to be protected activity; it is insufficient to merely identify or label conduct which is known to have occurred as either unlawful or improper." *Hutton v. Jackson Cnty.*, 2010 WL 4906205, at *9 (D. Or. Nov. 23, 2010), *aff'd*, 472 Fed. App'x 568 (9th Cir. 2012).

Plaintiff claims she made two disclosures that constitute "protected activity": (1) she expressed concerns to her manager that insufficient staffing endangered patient health and safety, and (2) she asked whether she should call a compliance hotline to report her concerns. However, neither action constitutes a "disclosure" as defined by Oregon law.

The Court agrees with Kaiser that expressing concern to a supervisor about intra-organization conditions does not constitute a disclosure. As clearly demonstrated by the record, Kaiser clearly understood staffing levels would impact the quality of patient care. Orr-Besa, Plaintiff's supervisor, was actively managing staffing to provide adequate patient care and was aware of the conditions Plaintiff believed to be "misconduct." Further, Plaintiff acknowledges that

8 – OPINION AND ORDER

during the COVID-19 pandemic, the entire healthcare sector was managing problems with staffing levels and patient care. Accordingly, Plaintiff never revealed "previously unknown information" to Orr-Besa. *See Hutton*, 2010 WL 4906205, at *9. Likewise, Plaintiff could not "disclose" anything to a compliance hotline because she would fail to "reveal anything new."

Plaintiff has not argued that she had engaged in any other protected activity as defined by ORS § 659A.203 or ORS § 441.181. Because she fails to establish the first prong of her prima facie case for retaliation under either statute, Kaiser is entitled to summary judgment on Counts 2 and 3.

### B. Rebutting an Employer's Proffered Legitimate Reason (Claims 1, 2, and 3)

Kaiser next argues it is entitled to summary judgment on Claims 1, 2, and 3 because Plaintiff failed to present sufficient evidence that Kaiser's legitimate, non-retaliatory reasons for terminating Plaintiff were pretextual. Def.'s MSJ., at 18–20.

After a defendant has proffered a legitimate, nonretaliatory reason for its adverse employment action, the plaintiff bears the burden of showing the defendant's reason is pretextual. *Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115, 1123–24 (9th Cir. 2000). A plaintiff can satisfy their burden "either by directly persuading the court that a [retaliatory] reason more likely motivated the employer or by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 1124 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). The plaintiff must produce evidence beyond that necessary to establish their prima facie case "in order to rebut the defendant's" proffered explanation. *See Wallis v. J.R. Simplot Co.*, 26 F.3d 855, 889–90 (9th Cir. 1994). A plaintiff may rebut the defendant's explanation with either direct or circumstantial evidence. *McDonnell Douglas*, 411 U.S. at 804–05; *Coghlan v. Am. Seafoods Co. LLC*, 413 F.3d 1090, 1094–95 (9th Cir. 2005). Direct evidence, "if believed, proves the fact [of

9 – OPINION AND ORDER

retaliatory purpose] without inference or presumption." *Coghlan*, 413 F.3d at 1095. Circumstantial evidence "requires an additional inferential step to demonstrate [retaliation]." *Id.* A plaintiff seeking to show pretext with circumstantial evidence alone "must put forward specific and substantial evidence challenging the credibility of the employer's motives." *Mayes v. WinCo Holdings, Inc.*, 846 F.3d 1274, 1282 (9th Cir. 2017); *see also Coghlan*, 413 F.3d at 1095.

Plaintiff contends that the events giving rise to her termination were motivated not out of Kaiser's conclusions from its internal investigation, but because Plaintiff raised concerns to Orr-Besa about the Clinic's staff shortages and inquired about a compliance hotline. Although Plaintiff cannot point to any direct evidence supporting her claim, she asserts that Kaiser's decision to terminate Plaintiff rather than place her on a progressive discipline plan is sufficient evidence of pretext. Pl.'s First Resp. 15. In addition, Plaintiff argues that Kaiser treated similarly situated employees differently because Kaiser only terminated Plaintiff. *Id*.

Neither of Plaintiff's arguments directly address—much less call into question—Kaiser's conclusion from its internal investigation that Plaintiff, *inter alia*, "committed gross negligence or misconduct[,]" "disregard[ed] protocol and instruction," "assign[ed] [MA's] to conduct Covid-19 screening[,]" and "pressure[ed] a witness." Orr-Besa Decl. Ex. 3, at 26. Kaiser conducted its investigation by interviewing several staff members, and Kaiser gave Plaintiff the opportunity to explain her side of the story. When weighed against the statements of her co-workers, they found Plaintiff to be untruthful. Kaiser's reasons for terminating Plaintiff were justified and clearly supported by the record. In fact, Plaintiff's pretext arguments are undermined by the timing of the alleged disclosures. Plaintiff raised her concerns regarding patient safety only *after* her shift lead confronted Plaintiff about the alleged misconduct during the September 9th shift.

10 – OPINION AND ORDER

Because Plaintiff fails to demonstrate specific and substantial evidence of pretext, Kaiser is entitled to summary judgment on Claims 1, 2, and 3.

### 2. Breach of Contract (Claim 4)

Next, Kaiser argues it is entitled to summary judgment on Plaintiff's breach of contract claim (Claim 4) because Plaintiff failed to establish that her union breached its duty of fair representation. State law breach of contract claims that require the interpretation of a collective bargaining agreement ("CBA") are preempted by Section 301 of the Labor Management Relations Act ("LMRA").[5] When resolving a state law claim is "substantially dependent upon the analysis of an agreement made between the parties to a labor contract, that claim must either be treated as a § 301 claim . . . or dismissed as preempted by federal labor-contract law." *Scott v. Machinists Trades Dist. Lodge No. 190 of N. Cal.*, 827 F.2d 589, 591 (9th Cir. 1987) (citing *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 220 (1985)). Because Plaintiff's breach of contract claim arises from and requires interpretation of the CBA, the breach of contract claim is preempted under § 301.

To successfully assert a § 301 claim, a plaintiff must prove two elements: (1) the union breached its duty under the CBA and (2) the employer breached the CBA by terminating the plaintiff. *DelCostello v. Int'l Bhd. Of Teamsters*, 462 U.S. 151, 164 (1983).

### A. Union's Breach of Contract

Unions, "as the exclusive bargaining representative for all employees in a given bargaining unit" have a duty of fair representation to their members. *Peterson v. Kennedy*, 771 F.2d 1244, 1253 (9th Cir. 1985). A union's duty of fair representation obligates it to "serve the interests of all members . . . with complete good faith and honesty, and to avoid arbitrary conduct." *Vaca v. Sipes*,

---

[5] "Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce . . . may be brought in any district court of the United States having jurisdiction of the parties." 29 U.S.C. § 185(a).

11 – OPINION AND ORDER

386 U.S. 171 (1967). A plaintiff alleging their union breached its duty by declining to advance the plaintiff's grievance to arbitration bears the burden of proving such breach. *Slevira v. W. Sugar Co.*, 200 F.3d 1218, 1221 (9th Cir. 2000) (citing *Vaca v. Sipes*, 386 U.S. 171, 186 (1967)).

"A union breaches its duty of fair representation when its 'conduct towards a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith.'" *Beck v. United Food & Com. Workers Union, Loc. 99*, 506 F.3d 874, 879 (9th Cir. 2007) (quoting *Vaca*, 386 U.S. at 190). A union's conduct is arbitrary "only when it is irrational, when it is without a rational basis or explanation." *Id.* (citing *Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 46 (1998)). Courts must give unions' decisions deference, "even if those judgments are ultimately wrong." *Marquez*, 525 U.S. at 45–46. Accordingly, a union may exercise a substantial degree of discretion without breaching its duty of fair representation. *See Marquez*, 525 U.S. 33 at 45–46; *see also Peterson v. Kennedy*, 771 F.2d 1244, 1253 (9th Cir. 1985) ("[U]nions must retain wide discretion to act in what they perceive to be their member's best interests.").

The Ninth Circuit has consistently held "that unions are not liable for good faith, non-discriminatory errors of judgment made in the process of grievances." *Slevira v. W. Sugar Co.*, 200 F.3d 1218, 1221 (9th Cir. 2000); *see also Peterson*, 771 F.2d at 1254 (citing *Castelli v. Douglas Aircraft Co.*, 752 F.2d 1480, 1482 (9th Cir. 1985). A union does not breach its duty of representation merely because it chooses to not advance a member's grievance to arbitration. *See Bliesner v. Commc'n Workers of Am.* 464 F.3d 910, 913–914 (9th Cir. 2006); *McClain v. Boeing Co.*, 444 F. App'x 980, 982 (9th Cir. 2011) (citing *Vaca*, 386 U.S. at 191). "It is for the union, not the courts, to decide whether and in what matter a particular grievance should be pursued." *Peterson*, 771 F.2d at 1254.

Here, Plaintiff has not submitted any evidence that her union's decision not to arbitrate her grievance was discriminatory or made in bad faith. Plaintiff's union represented her throughout Kaiser's internal investigation, the grievance process, and mediation following her termination. Moreover, the union consulted with legal counsel and conducted an analysis using the same reasonable factors it considers with every arbitration decision. At this stage of this suit, Plaintiff cannot demonstrate that the union breached its duty of fair representation. Accordingly, the Court need not address whether Kaiser breached the CBA by terminating Plaintiff. Because Plaintiff cannot establish a § 301 claim, the Court grants summary judgment on Claim 4 to Kaiser.

### 3. Wrongful Termination (Claim 5)

Finally, Kaiser argues it is entitled to summary judgment against Plaintiff's wrongful termination claim because Plaintiff has adequate statutory remedies that preclude a common law claim for wrongful termination. Under Oregon law, "[t]he tort of wrongful discharge was not intended to be a tort of general application but rather an interstitial tort to provide a remedy when the conduct in question is unacceptable and no other remedy is available." *Huitt v. Optum Health Services*, 216 F. Supp. 3d 1179, 1195 (D. Or. 2016) (citing *Roddy v. Cascade Gen., Inc.*, 206 P.3d 1070, 1075 (Or. App. Ct. 2009)). "Oregon courts have recognized two circumstances that give rise to the common-law tort of wrongful discharge: (1) discharge for exercising a job-related right of important public interest and (2) discharge for complying with a public duty." *Id*.

As discussed above, Kaiser is entitled to summary judgment on Claims 1–3 because Plaintiff cannot seek a statutory remedy under ORS § 659A.199 (Claim 1), ORS § 659A.203 (Claim 2), or ORS § 441.181 (Claim 3). But because Plaintiff fails to establish a prima facie case of retaliation under either statute, she does not have an adequate statutory remedy available to her. Consequently, she may pursue a common law wrongful termination claim as an alternative cause

13 – OPINION AND ORDER

of action. *See Grant v. Oregon City Sch. Dist. No. 62*, Case No. 3:16-cv-02202-YY, 2018 WL 2125991, at *8 (D. Or. Apr. 18, 2018) (wrongful termination claim is not barred because plaintiff fails to establish claims under ORS § 659A.199 or ORS § 659A.203).

However, Plaintiff has not demonstrated that she was terminated for "exercising a job-related right of important public interest" or for "complying with a public duty." *Huitt*, 216 F. Supp. 3d at 1179. In fact, the Court finds that there is no evidence from which a reasonable jury could infer that Plaintiff was fired because of her comments about a compliance hotline. As such, the Court grants summary judgment to Kaiser on Claim 5.

## CONCLUSION

Kaiser's Motion for Summary Judgment is GRANTED.

IT IS SO ORDERED.

DATED this 25th day of January, 2024.

_____/s/ Michael J. McShane_____
Michael McShane
United States District Judge